UNITED STATES, Appellee

v

HENRY D. SAMUELS, Boatswain's Mate First Class, U. S. Navy, Appellant

10 USCMA 206, 27 CMR 280

No. 11,746

Decided February 13, 1959

*Commander John P. Gibbons,* USN, argued the cause for Appellant, Accused.

*Major Ted H. Collins,* USMC, argued the cause for Appellee, United States. With him on the brief was *Commander Louis L. Milano,* USN.

## Opinion of the Court

HOMER FERGUSON, Judge:

After over seventeen years of commendable service in the Navy, which included an exemplary war record, accused stands convicted of various offenses, in violation of Articles 92, 127 and 134 of the Uniform Code of Military Justice, 10 USC §§ 892, 927 and 934, respectively.

This Court granted an appeal on the following issues:

1. Whether the convening authority's action in approving that portion of the sentence relating to a bad-conduct discharge, and rejecting the court's suspension thereof was illegal.

2. Whether the law officer erred to the material prejudice of the accused by failing to instruct the court that the suspended portion of the sentence was a nullity.

3. Whether the law officer erred in overruling the defense motion to dismiss the charges and specifications on the ground of inadequacy of the pretrial proceedings.

The facts, insofar as they are pertinent to the present appeal, are as follows: At the Article 32 investigation (Code, supra, 10 USC § 832) the prosecution produced five witnesses. Four of these, each of whom was cross-examined by civilian defense counsel, gave testimony linking the accused to the offenses for which he was subsequently tried and found guilty with the exceptions of specifications 4, 5, and 6 of Charge IV (one specification alleging the opening of a letter addressed to a named recruit, and two alleging gambling). Upon the completion of the examination of these witnesses, the investigating officer offered the statements of some fifty-eight other witnesses.

208

These witnesses had been transferred from the area and with one exception the investigating officer's report showed that each witness was at a station more than 100 miles away.[1] Of the statements civilian defense counsel read only three. She then rejected all the statements and objected to the investigating officer's considering them. The reasons for her action are substantially as follows:

(1) That the statements were obtained by experienced investigators from young recruits who "were promised nothing would happen to them."

(2) That the statements were not "volunteered" by the witnesses and were obtained "by goodness knows what means."

(3) That the accused was not accorded an opportunity to be present at the taking of the statements.

(4) That the evidence was "complete hearsay" and not "direct evidence."

At trial, defense counsel moved to dismiss the charges on the ground that the investigating officer had considered the statements of the unavailable witnesses.[2] On the argument of the motion there was some discussion as to whether or not the accused had requested the witnesses be produced. Defense counsel could not "in all truthfulness" recall whether such a request was made. But she conceded she knew "that they couldn't produce them there because he himself [the investigating officer] told me that they were all over . . . Bremerton, Washington, Pensacola, Florida, and what have you." However, she later twice asserted, without contradiction, that she had requested the presence of the unavailable witnesses "at the outset." Ultimately, the law officer denied the motion because the record of the pretrial proceedings did not show a "request that these witnesses be called." He reserved decision on that part of the motion which challenged the investigating officer's right to consider the statements over defense counsel's objection, apart from the availability of the witnesses. This part of the motion was later denied.

The court encountered grave difficulty in the wording of the sentence. During the sentencing considerations the president of the court stated that it desired to give the accused an opportunity to repay his "ill-gotten monetary gains" and to afford him the opportunity of making the Navy his career. After several false starts and a considerable number of suggestions from the law officer, the court-martial finally announced the sentence as follows:

"To be reduced to the grade of seaman; to forfeit fifty dollars ($50) per month for thirty-six (36) months; and to be discharged from the naval service with a bad conduct discharge, the bad conduct discharge to be suspended for a period of three (3) years during good behavior. At that time, unless the suspension is sooner vacated, the suspended portion should be remitted without further action."

The law officer at no time instructed the court-martial that the suspended portion of the sentence was a nullity. The convening authority specifically rejected the suspension of the bad-conduct discharge proposed by the court-martial and thereafter approved a bad-conduct discharge providing suspension thereof for either the period of confinement or completion of appellate review. See United States v Trawick, 10 USCMA 80, 82, Footnote 3, 27 CMR 154. The board of review, except for the dismissal of one Charge of which the accused had been found guilty, approved the findings and sentence.

The first issue.

We held in United States v Marshall, 2 USCMA 342, 8 CMR 142, that the

[1] In the exception the location of the witness was listed as "unknown."
[2] The record of the proceedings does not contain the statements but the parties have stipulated that none of them were taken under oath or affirmation and that only ten are presently on file in the Office of Naval Intelligence, Washington, D. C.

court-martial, as a jury, could not suspend a sentence. See also ■■■■■■■ ■ Zeigler v District of Columbia, 71 A2d 618 (DC Mun App) (1950), to the effect that:

". . . Since the decision of the Supreme Court in Ex parte United States, 242 US 27, 37 S Ct 72, 61 L Ed 129, LRA 1917E, 1178, Ann Cas 1917B, 355, it has been established that, in the absence of statutory authority, there is no inherent right in any court of the federal judicial system to suspend execution of sentence in a criminal case.

* * * * *

". . . The court had the power to impose the sentence and the void suspension does not void the sentence."

We therefore hold that the convening authority's action was within his power if the sentence was otherwise valid.

The second issue.

The pertinent circumstances are grounded on the following colloquy, in the course of which, as a result of the law officer's suggestions, the court-martial arrived at its final verdict:

"PRESIDENT: Henry DeWitt Samuels, boatswain's mate first class, U. S. Navy, it is my duty as president of this court to inform you that the court in closed session and upon secret written ballot, two-thirds of the members present at the time the vote was taken concurring, sentences you:

To be reduced to the grade of seaman; to forfeit fifty dollars ($50) per month for thirty-six (36) months; and to be discharged from the naval service with a bad conduct discharge, the bad conduct discharge to be held in abeyance for a period of three (3) years during good behavior.

It is the opinion of this court, in view of the long and previous honorable service of the accused, that he be afforded the opportunity to repay to society his ill-gotten monetary gains. This sentence enables him, if his stated desire to make the Navy a career is sincere, to continue toward that end.

* * * * *

"LAW OFFICER: The law officer will declare a recess at this time for fifteen minutes, during which time he will ask the court reporter to reduce the sentence—transcribe the sentence so that he may study it as to its legality. The court is recessed for a period of fifteen minutes.
"The court recessed at 1533 hours, 15 August 1957.
"The court opened at 1550 hours, 15 August 1957.

* * * * *

"LAW OFFICER: It appears to the law officer that the sentence is somewhat ambiguous, not being drafted according to one of the familiar forms of sentences—which is quite understandable under the circumstances since the court did not have the Manual with it during its deliberations. The law officer would like to inquire the intent of the court in the phrase 'the bad conduct discharge to be held in abeyance for a period of three years during good behavior.' Was it the intention of the court to suspend operation of the discharge for three years providing that during that time the accused's behavior was satisfactory to his commanding officer or commanding officers during that period?
"(The president conferred with the members of the court.)
"PRESIDENT: Will the reporter please re-read the question of the law officer. Read it slowly, please.
"The reporter complied.
"PRESIDENT: I think the court had better be closed for a short while. The court will be closed.

* * * * *

"PRESIDENT: In answer to the law officer's last question before the court was closed, the court wishes to say that the answer is yes, with the following clarification: —does the law officer wish to hear the clarification?
"LAW OFFICER: Yes.
"PRESIDENT: If at the end of the three-year period the suspension

210

has not been vacated, the BCD will be remitted.

"LAW OFFICER: In other words, the court intended to include 'unless the suspension is sooner vacated, the suspended portion shall be remitted without further action'?

"PRESIDENT: That is correct.

"LAW OFFICER: It is suggested that the court close and rephrase the sentence so that the ambiguity will be removed. It is possible to interpret it, as it is now worded—in fact, it would be almost necessary to interpret it, as now worded, that he would serve three years and then the sentence would be executed, and the law officer felt that that might not be the intent of the court.

"PRESIDENT: The court apologizes for the ambiguity, and will the law officer please read that last phrase.

"LAW OFFICER: 'At that time, unless the suspension is sooner vacated, the suspended portion shall be remitted without further action.' It is the law officer's feeling that this cures any ambiguity and in no way increases the severity of the sentence and that, therefore, the change to implement the original intention of the court is proper.

"PRESIDENT: I think the court should close at this time. The court will be closed.

. . . . .

"PRESIDENT: The court has completed the draft. Would the law officer like to look at it?

"LAW OFFICER: The law officer, unfortunately, is not permitted to look at the draft before the sentence is announced.

"PRESIDENT: Would you like it re-read?

"LAW OFFICER: Yes.

. . . . .

"PRESIDENT: Henry DeWitt Samuels, boatswain's mate first class, U. S. Navy, it is my duty as president of this court to inform you that the court in closed session and upon secret written ballot, two-thirds of the members present at the time the vote was taken concurring, sentences you:

To be reduced to the grade of seaman; to forfeit fifty dollars ($50) per month for thirty-six (36) months; and to be discharged from the naval service with a bad conduct discharge, the bad conduct discharge to be suspended for a period of three (3) years during good behavior. At that time, unless the suspension is sooner vacated, the suspended portion should be remitted without further action.

"LAW OFFICER: And that represents the original intention of the court?

"PRESIDENT: That does."

In view of the remarks by the president of the court-martial, made against the backdrop of the accused's commendable naval record, if the court-martial had been advised that the sentence was void and that the attempt to suspend the bad-conduct discharge was not binding upon the convening authority, it may well have adjudged a sentence which did not include a bad-conduct discharge.

We said in United States v Linder, 6 USCMA 669, 20 CMR 385, that:

". . . [T]he members of a court-martial are not presumed to know the law. Their source of knowledge of the law is the law officer."

Obviously, the law officer erred to the material prejudice of the accused by failing to instruct the court that the suspended portion of the sentence was a nullity.

The third issue.

The evidence upon which specifications 4, 5, and 6 of Charge IV have been predicated must have been gleaned from statements of some of the unavailable witnesses. The question with which we are confronted is whether or not prejudicial error occurred when the investigating officer considered these statements.

Article 32(b) of the Uniform Code, supra, provides in part:

". . . At that investigation full opportunity shall be given to the accused to cross-examine witnesses

against him if they are available. . . ."

It is apparent that the Article serves a twofold purpose. It operates as a discovery proceeding for the accused and stands as a bulwark against baseless charges. See Manual for Courts-Martial, United States, 1951, paragraph 34, page 45. It is judicial in nature. United States v Nichols, 8 USCMA 119, 23 CMR 343; cf. Wood v United States, 128 F2d 265 (CA DC Cir) (1942); United States v Zerbst, 111 F Supp 807 (ED SC) (1953). But it is *ex parte* in that the Government is not formally represented as a party. Article 32, Uniform Code of Military Justice, and paragraph 34, Manual for Courts-Martial, both supra; see Feld, Manual of Courts-Martial Practice and Appeal, § 23, page 40 (1957). It is also a preliminary proceeding, not a trial on the merits.

As we have noted, the record here shows that certain witnesses did not appear before the investigating officer who considered them to be unavailable. Upon the question of availability, the hearings before a subcommittee of the Committee on Armed Services of the House of Representatives, 81st Congress, 1st Session, on H. R. 2498 (the Uniform Code of Military Justice), discloses the following limited colloquy:

"MR. ANDERSON: Now, to what extent do the services go to insure the fact that the witnesses will be available?

. . . . . .

"MR. SMART: It is subsequently prescribed in article 49(d)(1) that more than 100 miles may be construed as a reasonable distance."

We need not now decide whether or not distance and the grounds set out in Article 49 of the Uniform Code, supra, 10 USC § 849, constitute the only guideposts upon the question of unavailability. However, we add the caveat that the investigating officer should set out the circumstances upon which the conclusion of the unavailability is predicated.

The fundamental question which now confronts us is how the statements of the unavailable witnesses come before the investigating officer. In other words, the inquiry is whether the investigating officer is bound by the same rules of evidence that apply at the trial itself. Cutting through defense counsel's confusion of ideas, it appears that this is part of the question she attempted to raise by objecting to the investigating officer's consideration of the statements.

A great deal of attention was given to the problem by Professor Wigmore in his eminent work on Evi dence. After reviewing the history and purpose of the rules of evidence, he concluded they were "devised for special control of trials by jury." They are not "supreme end[s] in themselves" but merely "tools for truth." He contends, therefore, that they are inappropriate in preliminary proceedings in which the decision of the judge is not final, the determination is discretionary, and there are "no opponents" as such to invoke the rules. Relying upon Professor Wigmore's text, the Supreme Court of the United States has said: "The ordinary rules of evidence are generally not applied in *ex parte* proceedings." Brinegar v United States, 338 US 160, 175, 69 S Ct 1302, 1310, 93 L ed 1879, 1890, footnote 12. Speaking specifically of a preliminary examination by a magistrate, the Supreme Court of Kansas said: "Proceedings in a preliminary examination are not expected nor required to be as regular and formal as in a final trial. The same strictness as to the admissibility of evidence is not as necessary where probability of guilt is at issue as when actual guilt is the matter on trial." McIntyre v Sands, 128 Kan 521, 278 Pac 761. It has been said that: "Preliminary examination affords, and is designed to afford, general information to the person held to answer respecting what he must meet." State v Powell, 120 Kan 772, 777, 245 Pac 128, 131.

In Ex parte Hollingsworth, 49 Idaho 455, 289 Pac 607, the defendant challenged the legality of his detention on a charge of arson by a committing magis

trate. The question before the court was the admissibility at the preliminary hearing of a statement by a witness concerning the accused's alleged implication in the crime. At the hearing, the witness appeared and testified. He admitted making the statement, but said that it was entirely false. The Supreme Court of Idaho held that the witness's written statement was properly considered by the committing magistrate. The court said the statement constituted a "positive statement of direct knowledge" by one who knew of the crime, and that it was "too technical to hold [it] inadmissible upon a preliminary hearing." See also McCurdy v State, 39 Okla Crim 310, 264 Pac 925.

In our opinion, Article 32 does not require the investigating officer "to decide difficult legal questions." See United States v Zerbst, supra; People v Lightstone, 330 Mich 672, 48 NW2d 146. Nor does it require him to adhere to the strict rules of evidence.

While unavailability affects the accused's right to cross-examine, it does not preclude the investigating officer from considering the statements of the witnesses.[3] The question remains as to whether there is any limitation as to the statements which may properly be so considered by the investigating officer.

Both Article 32 and the Manual point to at least one limitation, namely, that the statement must be made under oath or affirmation. In a judicial proceeding the sanctity of the oath or the force of the affirmation, and, we may add parenthetically, the penalties of law that accompany a violation of either, give initial assurance as to the truth of the testimony. Since Article 32 is an inquiry into the "truth" of the charges, some assurance is required to insure the witnesses do speak truthfully. The single circumstance which in the first instance permits us to regard information as true is the fact that it is given under oath or affirmation. In that connection, paragraph 34d of the Manual,

supra, expressly provides that witnesses "who give evidence during the investigation should be examined on oath or affirmation." The requirement of an oath or affirmation is further suggested by the constitutional requirement in the related preliminary proceedings for the issuance of a warrant of arrest. Under the Fourth Amendment to the United States Constitution no warrant can issue, "but upon probable cause, supported by Oath or affirmation." We are, therefore, led to the conclusion that the statement of a witness may be considered by the investigating officer only if it is supported by oath or affirmation.

Here, the record affirmatively shows that the statements of the unavailable witnesses were signed but were not under oath or affirmation. Consequently, when objected to by defense counsel, they should not have been considered by the investigating officer. True, defense counsel did not pinpoint the basis of her objection to the investigating officer's consideration of these statements at the pretrial level. However, her objections clearly included an assertion that the statements were not entitled to consideration by the investigating officer. She, therefore, sufficiently put him on notice that the statements should not be the subject of his scrutiny because of their unreliability. The error was thus preserved for appropriate relief at the trial. See United States v Phillips, 3 USCMA 557, 13 CMR 113.

Consequently, we hold that the law officer erred in failing to grant appropriate relief as to this part of the defense motion.

The findings of guilty as to specifications 4, 5, and 6 of Charge IV and the sentence are set aside. The record of trial is returned to The Judge Advocate General of the Navy for remand to a competent convening authority. In his discretion, the convening authority may direct an Article 32 investigation of said specifications and if justified by the evidence therein order a rehearing as to the said specifications and the sen-

---

[3] This does not mean that the accused cannot question the witness at all. There is still open to him the deposition proceedings provided by Article 49. In this way he may examine the witness on direct or cross-examination.

tence, or dismiss the specifications and order a rehearing on the sentence alone, or reassess the sentence on the basis of the remaining specifications, without, however, including a bad-conduct discharge.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I

I concur in part and dissent in part.

I agree with the treatment accorded the first issue in the majority opinion, but with respect to the second and third issues I must voice disagreement.

II

While accepting the principle announced in United States v Marshall, 2 USCMA 342, 8 CMR 142, ■ that a court-martial lacks authority to suspend a punitive discharge, my associates do not give credence to other concepts therein announced. By way of illustration, I invite attention to the following matters. We held in that case that the sentence imposed by the court was not void and in this instance my brothers say it is. In the case at bar they reject a conclusion I find contained by necessary implication in that opinion—namely, the failure to instruct the court-martial that it did not have the power to suspend the execution of the bad-conduct discharge was not error. While we did not mention that particular question in *Marshall*, because the issues were narrowed by the certificate of The Judge Advocate General of the Navy, nevertheless, we held that the sentence imposed by the court-martial was an "entirely valid sentence to a bad-conduct discharge." Had the special court-martial president in *Marshall*—and I note parenthetically that his sua sponte duties are identical to those of the law officer, see United States v Pinkston, 6 USCMA 700, 21 CMR 22—been obliged to inform the court-martial that the attempted suspension was a nullity, then I submit we reached the wrong result.

Obviously, I reject the Court's holding that the sentence imposed by the

214

court was void, for it is a cardinal principle of law that if a sentence is divisible into separate parts, some of which are legal and others illegal, the former are valid and enforceable. This concept is well expressed by Judge Brosman in *Marshall*. That was a unanimous opinion and there he stated the correct principle with clarity and preciseness. I quote his language:

"The board of review held that the court's imposition and suspension of a bad-conduct discharge was void in toto. We cannot agree. Although its attempt to suspend was certainly without legal effect, we see no reason whatever why that vice should extend as well to the imposition of the discharge. In the following the course it did, the court was required to take two steps. First, it was necessary that the discharge be adjudged, and second, it was necessary that its execution be suspended. These two steps were, by their very nature, wholly separate and distinct, and, therefore, severable. Being severable, the illegality in the second does not at all touch the first. Accordingly, as the case reached the convening authority, it carried an entirely valid sentence to a bad-conduct discharge."

The opinion in the instant case overturns that principle, for it fails to affirm the court-martial's power to determine the appropriateness of sentence and reject its authority to suspend its execution. The former is a proper matter for the court's consideration and the latter is not. United States v Simmons, 2 USCMA 105, 6 CMR 105; United States Marshall, supra. To support that rule I need go no further than to point out that the prevailing opinion acknowledges the want of power in the court to order that execution of the sentence be suspended and I am well convinced that its tenor is to the effect that imposition of a punitive discharge is within the authority of the court-martial. Yet the Court strikes down both.

Based on the premise that the sentence announced was valid in part and invalid in part, I consider the contention that the law officer erred by not informing the court-martial it could not order

the suspension of execution of part of the sentence. While I hold no brief for the uncertain manner in which the law officer temporized with the court on the suspension, I am not convinced he erred against the accused. It must be remembered that when he first heard the sentence announced, he found himself in a situation where the court was exceeding its authority in aid of an accused, and a word from him would defeat that purpose. Counsel for the accused very appropriately suggests that the court members wanted to make certain reviewing authorities would not ignore accused's appeal for clemency and so they recorded their views in the sentence. Therefore, in holding that the law officer erred when he failed to advise the court-martial it was illegal to include that portion of the sentence favorable to the accused, the Court places that officer in a hopeless predicament. Certainly, the accused did not oppose its inclusion, and no doubt he rejoiced until the convening authority refused to be bound by its terms. I must, therefore, conclude that if the law officer had instructed the court, the accused would have been before us asserting his substantial rights were prejudiced. Apparently the law officer has no haven from error.

The main thrust of my associates' argument is that accused was prejudiced by the failure of the law officer to speak. My reading of the record places us poles apart. They take the view that had the law officer informed the court that the attempted suspension was ineffectual, the members might "well have adjudged a sentence which did not include a bad-conduct discharge." It is very well for the accused to make that contention on appeal, but he had little faith in it at the time of trial. He could have objected then and put the court to the test but, in the light of his transgressions, I can well understand why he did not. He had been convicted of a substantial number of serious offenses which permitted a maximum imposable period of confinement of more than thirty years. He had been in command of recruit training companies, and the court-martial found him guilty of having extorted or stolen some $1,800 from recruits. He even had them contributing to his coffers as a condition precedent to passing final inspection. When one in command stoops to that level, he is most fortunate to be permitted to remain in the service even though retention is conditioned upon three years' good behavior. Now it is suggested he might be left in good standing with no conditions imposed. But, in addition, prior to the time the law officer was put on notice that any instruction on suspension should be given, the court had already announced a sentence which included a bad-conduct discharge, a reduction of the accused to the grade of seaman, and forfeiture of $50 per month for thirty-six months. Thus, any instruction at that time would have merely prevented the court from expressing its desire of giving accused an opportunity to rehabilitate himself. While the court-martial had demonstrated a wish to hold the punitive discharge in abeyance, they exhibited no reluctance to assess it as part of their sentence. Under these circumstances, I can see no fair risk that, had they been instructed their proposed action was merely advisory, they would have eliminated the discharge and adjudged only the reduction and forfeitures. On the contrary, I can only conclude that their action, had they been fully informed, would have resulted in a bad-conduct discharge and a recommendation for clemency directed to the convening authority. Since this was the precise legal effect of the sentence as announced, I find no prejudicial error in this regard.

IV

Turning to the third granted issue, I agree generally with my colleagues that written statements of absent witnesses need not be in the form of depositions in order to be given weight by an investigating officer during the Article 32 investigation and that such statements may be considered without regard to the strict evidentiary rules applicable at trial. However, I disagree with the ultimate conclusions that they cannot be used unless they are sworn to under oath and that this accused has any legal

standing to raise this purported irregularity on appeal.

While not disputing the general salutary effect of an oath or affirmation upon a statement in that it ordinarily invites greater credence, I see no reason why an investigator may not place some credit on the reliability of unsworn statements. It is standard practice for all investigators to obtain written statements of that nature, and surely they are not presumed false. Moreover, I can think of many instances where a rigid exclusionary application of the rule announced by the Court would serve only to impede the discovery of truth for no good purpose. Particularly is this true when the military situation is such that witnesses must be interviewed without interrupting their primary duties. We must not overlook the essential requirement that military law must be workable in time of war as well as in periods of peace. But more important is the clearly expressed Congressional intent to give the accused some sort of exploratory hearing in which the Government must show the probability that an offense has been committed and he is permitted to learn the identity of witnesses, the substance of their expected testimony, and the strength of the Government's case without the formalities required by a trial on the merits. In that connection, it is worth reviewing the history of the law granting the right to a pretrial investigation to show that Congress never contemplated the requirement which the Court now grafts on to the law.

I shall commence my historical development by stating categorically that Congress has never passed a statute which required that witnesses furnishing testimony at a military pretrial investigation had to be sworn. While over a span of years the rights and privileges incident to the hearing have been enlarged by Executive proclamation, I propose to show that from 1917 to 1951 the Congressional statutory enactments have not made mention of any necessity for sworn testimony. Significantly, every Article of War touching on the oath of witnesses is strictly limited to witnesses appearing before courts-martial.

Prior to 1917, there was no such proceeding as the one for which provision is now made by Article 32. At that time, the officer immediately exercising summary court-martial jurisdiction over the command to which the accused was assigned could himself make a preliminary inquiry or cause some other officer to make an informal investigation, but that proceeding was to aid the officer in deciding whether or not the accused should be punished under Article of War 104, by a summary court, or whether the charges should be referred to the officer exercising jurisdiction in the higher courts. The investigation could be reported either orally or in writing but, in his endorsement to the superior authorities, if that course became necessary, the commanding officer was required to include only the following information: The name of the officer who investigated the charges, the opinion of both the investigating officer and himself as to whether charges could be sustained, the substance of any material statement voluntarily made by the accused, a summary of the extenuating statements, if any, and his recommendation of the action to be taken. No mention was made of swearing witnesses or of perpetuating or forwarding testimony.

In 1919, there were extensive hearings on the revisions of the Articles of War and, in the hearings before the subcommittee of the Committee on Military Affairs, United States Senate, 66th Congress, 1st Session, page 511, there is reported certain information concerning changes to the Manual for Courts-Martial, U. S. Army, 1917. The information discloses that on July 14, 1919, the War Department, by Change No. 5, Manual for Courts-Martial, U. S. Army, 1917, provided for a more complete investigation of charges. It was therein prescribed that if the officer immediately exercising summary court-martial jurisdiction concluded that charges should be tried by a special or general court-martial, he must, before taking further action thereon, either investigate himself or have them investigated by an officer other than the one preferring charges. The investigating officer was required to afford the accused

an opportunity to make any statement, call any witness, offer any evidence, or present any matter in explanation or extenuation of his alleged offense which he would care to have considered. All material testimony given by any witness in person had to be reduced to a succinct statement which the witness should later read and sign. When it was not practicable to obtain the personal testimony from any witness, either for the prosecution or the defense, the regulation required that a written statement be obtained, if possible, the statement to show the testimony expected from such witness. In submitting his report to the superior authority, the investigating officer was required to enclose papers, documents, and signed statements of witnesses. The report was also required to include any known document or other matter of evidence not enclosed but which might become important or necessary in the case. The whole tenor of this regulation compels the conclusion that the investigating officer was not limited to a consideration of testimony under oath.

It is interesting to note that the provisions in the Manual for Courts-Martial, U. S. Army, 1921, are subject to the same interpretation, although at that time the witnesses appearing at the hearing were to be sworn. Paragraph 76a(8), provided as follows:

"The officer so proceeding with the investigation (whether the commanding officer himself or another officer) will examine all available witnesses and documentary evidence in the same manner hereinbefore directed in clause No. 3 of this paragraph, except that he will, upon such examination, reduce the material testimony given by each witness, on direct examination and on cross-examination, to a clear, succinct statement or summary (for form, see Appendix 18), which, in the presence of the accused, will be read over to the witness and signed and sworn to by him. When it is not practicable to obtain personal testimony from any distant witness, whose testimony is deemed material, either for the prosecution or for the defense, a signed written statement from such witness will be obtained by the investigating officer, if practicable, of the testimony which the witness would give if present, and will be shown to the accused, and included with the summaries of the testimony of the witnesses examined in person, among the documents returned with the report of the investigation. Any available papers or documents which may serve to throw light on the case will be likewise shown to the accused, and returned with the report of the investigation."

Clause No. 3 mentioned in the above-quoted paragraph required the commanding officer of the accused to call before him within twenty-four hours the accuser, all available witnesses mentioned in the memorandum of charges, the accused, any available witnesses desired by the accused, and any other available witness of whom the commander might learn. No mention is made of nonavailable witnesses, but those witnesses appearing in person were to be sworn, even though no record was to be made of the testimony.

In 1928, the pendulum swung in the other direction as to the live witnesses, for in supplementing Article of War 70, the framers of the Manual set out the following instructions:

"*Instructions*.—At the outset of the investigation the accused will be informed of the following: The offenses charged against him; the names of the accuser and of the witnesses, as far as then known to the investigating officer; the fact that the charges are about to be investigated; his right to cross-examine witnesses against him if they are available and to present anything he may desire in his own behalf, either in defense or mitigation; his right to have the investigating officer examine available witnesses requested by him; and his right to make or submit a statement in any form subject to the risk of having such statement used against him.

". . . Witnesses need not be sworn or required to sign their statements, but either or both will be done if the investigating officer deems such action advisable or is so instructed." [Manual for Courts-Martial, U. S. Army, 1928, paragraph 35a.]

**217**

It is of some importance to note that at that time it was expressly provided in the Manual that witnesses appearing at the hearing need not be sworn.

Passing along to the Manual for Courts-Martial, U. S. Army, 1949, and Article of War 46(b) of that date, I find that for all practical purposes the wording of that Article is the same as the present Article 32 and similar to the previous enactments. In reference to the instructions supplementing the Article of War, paragraph 35a of the Manual for Courts-Martial, U. S. Army, 1949, prescribes the following:

". . . Although exceptions may be made by the investigating officer, he will ordinarily require witnesses who are examined during the investigation to sign and swear to the truth of the substance of their statements after they have been reduced to writing. . . .

"When the investigating officer makes known to the accused the substance of the testimony expected from a witness as ascertained from a written statement of the witness, interview with the witness, or other similar means, and the accused states that he does not desire to cross-examine such witness, the witness need not be called even if available."

and

"To the extent required by fairness to the Government and the accused, documentary evidence and statements of witnesses who are not available will be shown, or the substance thereof will be made known, to the accused and to his counsel if counsel has been requested."

In connection with the formal report, it was specifically provided that it should contain any statement, document, or matter considered by the investigating officer in reaching his conclusions or making his recommendations or recitals of the substance or nature of such items.

That brings me up to the present time and, before discussing the provisions of the Manual for Courts-Martial, United States, 1951, I parenthetically note that I consider the Manuals

to be more than mere gloss on the Uniform Code of Military Justice. They were promulgated pursuant to Acts of Congress which authorized the President to prescribe the procedure for courts-martial, and the only limitation imposed was that they should not be contrary to or inconsistent with statutory enactments. Thus the President may add to the statutory requirements or prescribe procedures to fill in the interstices, and what he adds has the force of statutory law.

A reading of paragraph 34 of the Manual for Courts-Martial, United States, 1951, shows the accused has, inter alia, been granted the following rights and privileges insofar as Article 32 is concerned: The right to cross-examine witnesses against him if they are available; the right to have the investigating officer examine available witnesses requested by him; the privilege of making a statement in any form; and he is entitled, unless it is unfair to the Government, to have documentary evidence and statements of the witnesses who are not available shown to him. In his report on the investigation, the investigating officer will enclose, among other things, a statement of the substance of the testimony taken on both sides and any other statements, documents, or matters considered by him in reaching his conclusion or making his recommendations. While the Code does not so provide, paragraph 34d states that witnesses who give evidence during an investigation should be examined on oath or affirmation, but it is to be remembered this applies only to witnesses who appear in person.

It seems to me that from all of the foregoing statutes and Manual provisions, the following fundamental principles stand out irrefutably. First, a pretrial hearing is a creature of statute, the benefits of which Congress need not have extended to members of the armed forces. Second, it is a preliminary matter in which all constitutional and statutory guarantees need not be extended to an accused. Third, the right of confrontation is not absolute, for availability of witnesses admits much latitude of interpretation. Fourth, evidence, both real and testimonial, may be ob-

218

tained by an investigating officer and used to support his finding of probable cause without regard to the rules of evidence applicable to courts. Fifth, the various Federal military criminal statutes have required only witnesses appearing before courts-martial to be sworn. Sixth, whether witnesses who appear in person or furnish statements must be sworn depends not upon the statute but upon the provisions of the Manuals. And last, but most important to the present issue, is that no law or Executive proclamation has required the statements of nonavailable witnesses to be verified.

Summing up the requirements prescribed in the various Manuals, I find that in 1917, the preliminary investigation did not require the taking of testimony, so at that time the question of administering oaths was irrelevant. In 1921, the witnesses who appeared at the hearing in person were required to sign and swear to a summary of the testimony furnished by them. In 1928, that provision was discarded, and it was specifically provided that witnesses were not required to be sworn or required to sign their statements but that either action could be taken if deemed advisable by the investigating officer. At that time, it was made optional with the officer as to whether the witnesses would swear to the truth of the substance of their statements. The Manual for Courts-Martial, U. S. Army, 1949, carried out this same concept. In light of that historical development, I am certain the provision of the Manual for Courts-Martial, United States, 1951, stating that the available witnesses "should" be sworn, is merely advisory and not mandatory.

But, even if I reject that interpretation and conclude that available witnesses who appear must be sworn, I cannot find any authority for the proposition that statements taken from unavailable witnesses need have the dignity of a jurat's authentication. Neither can I find any good reason for this Court writing such a provision into the law. The rights granted to an accused are adequate to protect him from all unfounded charges and to allow him to prepare his defense properly. If wit-

nesses appear at the pretrial investigation, they can be placed under oath and he can exercise his right of cross-examination. He can ascertain the other testimony available against him if he is shown the statements of witnesses not called. If he desires to have those who are available appear and corroborate their statements under oath, he can make that request and, if he desires to have sworn testimony from those who are not available, he can accomplish that by requesting the taking of depositions. Fundamentally, he is afforded all the protection that is necessary to accomplish the purpose of a pretrial hearing.

As to the requirement that there be sufficient evidence before the investigating officer to support a finding of probable cause, there is no necessity for requiring that his conclusion must be predicated upon sworn testimony. Many records, documents, and real evidence can be used by him without erecting the foundation which would make them admissible at trial. Under the Manual provision, he is authorized to interview witnesses and merely state the substance of their testimony to the accused. All of that can be done without sworn testimony, and there is no good reason to deny him the right to rely on the contents of written statements, at least until there is some showing that they are false. And if they are false, that fact can be shown at the trial.

In this particular instance, there were approximately sixty witnesses whose testimony was reduced to writing. An extensive investigation was being conducted and, while it may well be that under peaceful conditions it would add no great administrative burden to the services to have witnesses swear to their statements, at other times it might be extremely inconvenient. And what we decide has to fit both situations. Accordingly, in the final analysis in this case, I find no substantial reason for setting aside good and valid findings of guilt. They were rendered in a full-scale trial where the accused was given the privilege of having witnesses testify under oath, the right to confront them, the privilege to determine the falsity of their pretrial statements, and the protection of all other guarantees provided

for by Congress. He was furnished with the expected testimony of every witness so he could prepare for trial, and his counsel was prepared to cross-examine them under oath. Therefore, I say, to grant the accused a rehearing merely because statements used in a preliminary investigation were not executed before one authorized to administer an oath is not only contrary to the law but carries mythical rights to fantastic extremes.

In one other area I part company with my brothers. We have repeatedly held that in order to raise errors ■■■■ occurring at the pretrial investigation, a motion for appropriate relief should be made prior to plea. United States v Gandy, 9 USCMA 355, 26 CMR 135; United States v Tomaszewski, 8 USCMA 266, 24 CMR 76; United States v Allen, 5 USCMA 626, 18 CMR 250; United States v McCormick, 3 USCMA 361, 12 CMR 117. For the motion to be proper, it must request relief which is appropriate and it must be specific enough to call to the attention of the law officer the particular deficiencies so they might be corrected prior to trial. In the case at bar, there were two fundamental shortcomings in the motion. First, the relief requested was a dismissal of all charges and specifications, which obviously was inappropriate. At the most, the accused was entitled only to have a new pretrial investigation ordered. Second, the basis upon which defense counsel predicated their motion is clearly discernible, and I defy anyone to find in it any suggestion that the statements were being assailed because they were not notarized. When the arguments, and such confusion as my associates believe exist, are cast aside, the motion is one made solely and simply on the basis that the accused was denied confrontation of the witnesses. To extend that reason to include an objection to statements upon the ground that they were not sworn to is to say that the words "I object" point up all errors.

The law officer properly overruled the motion, for I believe all reported cases from Federal courts and military authorities hold that military law does not grant to an accused the right of confrontation in a pretrial investigation. The present opinion goes that far but then goes off on a tangent to hold that defense counsel had something else in mind. All I can say in this regard is that, if they did, they failed to communicate their thoughts to the law officer. To say he was, or that any other legally trained person should have been, put on notice that defense counsel wanted a new pretrial investigation in which the witnesses were under oath, is indeed remarkable. Particularly is that idea negatived by the fact that the witnesses were then in the courtroom and could have been sworn. If that was the irregularity counsel was seeking to purge, it was cured very shortly after the motion.

I would affirm the decision of the board of review.